# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | Sidney I. Schenkier |
|---|---|---|---|
| **CASE NUMBER** | 01 C 763 | **DATE** | 3/29/2001 |
| **CASE TITLE** | iXL, Inc. vs. Adoutlet.com, Inc. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] **ENTER REPORT AND RECOMMENDATION.** The Court respectfully recommends that plaintiff's motion for preliminary injunction [doc.# 11] be denied. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed.R.Civ.P. 72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. See Video Views, Inc. v. Studio 21, Ltd., 797 F.2d 538, 539 (7th Cir. 1986).

(11) ■ [For further detail see order attached to the original minute order.]

| | | |
|---|---|---|
| | No notices required, advised in open court. | |
| | No notices required. | |
| ✓ | Notices mailed by judge's staff. | |
| | Notified counsel by telephone. | |
| | Docketing to mail notices. | |
| | Mail AO 450 form. | |
| ✓ | Copy to judge/magistrate judge. | |

number of notices

3/30/01
date docketed

C.S.
docketing deputy initials

3/29/2001
date mailed notice

Document Number: 26

JJK
courtroom deputy's initials

JJK
mailing deputy initials

Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| IXL INC.,<br>a Delaware corporation | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | No. 01 C 0763 |
| | ) | |
| v. | ) | Judge Gettleman |
| | ) | |
| ADOUTLET.COM, INC.<br>a Delaware corporation, | ) | Magistrate Judge Schenkier |
| | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

At its core, this case presents a basic contract dispute between iXL, Inc. ("iXL") and

AdOutlet.Com, Inc. ("AdOutlet"). In its amended complaint, iXL claims that it entered into a

contract with AdOutlet to provide consulting and web design services for a fee; that iXL provided

the services; that iXL billed AdOutlet $2,913,708.00 for the work and expenses associated with those

services; but that AdOutlet has only paid only $1,195,505.00 of the billed amount, leaving a

substantial shortfall that iXL now seeks to collect under theories of breach of contract, accounts

stated, open book account, and quantum meruit (Amended Complaint, Counts I-IV). AdOutlet

denies that it owes iXL anything beyond what AdOutlet already has paid; indeed, AdOutlet

complains it has paid too much, and has asserted a breach of contract counterclaim seeking recovery

of an unspecified amount for "significant costs and expenses" that AdOutlet allegedly has incurred

because AdOutlet had to correct short-comings in iXL's performance.

Because the services for which the parties contracted involve copyright and other intellectual

property, both the amended complaint and the counterclaim seek to expand this case into far more

than a mere contract dispute. iXL claims that AdOutlet is using computer source code property that

26

iXL created, but for which AdOutlet has not paid, and that AdOutlet thus has committed misappropriation, conversion and unauthorized use of intellectual property in violation of common law (Count V), and copyright infringement in violation of 17 U.S.C. § 101, *et. seq.* (Count VI). For its part, AdOutlet asserts that it owns this source code, and that by iXL's copyright application, iXL has committed the common law tort of conversion (Counterclaim, Count II) and has violated the Digital Millennium Copyright Act, 17 U.S.C. § 1202 (Counterclaim, Counts III-IV).

It is this intellectual property side of the case that brings the matter before the Court at this time. iXL has moved for a preliminary injunction (doc. # 11), seeking to bar AdOutlet from using the computer code and intellectual property allegedly supplied by iXL on AdOutlet's web site. AdOutlet, naturally, resists this motion. By an order dated February 16, 2001 (doc. #14), the motion for preliminary injunction was referred to this Court for all necessary pre-trial proceedings and a report and recommendation. The parties have fully briefed the motion, and have agreed that the matter may be submitted for decision without the need for in-court testimony. On March 14, 2001, the Court heard oral argument on the motion.

Based on the documentary record and the arguments of the parties, the Court concludes that iXL has failed to make an adequate showing of likelihood of success or irreparable harm to support a preliminary injunction. Therefore, the Court respectfully recommends that the motion for preliminary injunction be denied. In part I of this Report, we set forth the factual background relevant to this Court's recommendation. In part II, we explain the reasoning that leads to this recommendation.[1]

---

[1] On March 21, 2001, after the briefing and hearing on the preliminary injunction motion iXL filed a second amended complaint, which adds a common law claim for fraud, misrepresentation and deceit (Count VII). The first six counts remain unchanged from the amended complaint, and iXL does not seek any injunctive relief on its fraud claim.

# I.

**A.      The Parties.**

1.      iXL, a Delaware corporation with its principal place of business in Georgia, is engaged in the business of providing professional services to internet companies, including consulting and web design services (Second Amended Complaint ("S.A.C."), ¶ 1). iXL provides its services to customers on a project basis, and charges for its work based on an hourly fee for the work performed, as well as the expenses incurred in performing the work (*Id.*).

2.      AdOutlet is a Delaware corporation which does business in the State of Illinois (S.A.C., ¶ 2). AdOutlet's core business activities are the "aggregation, presentment, and transacting of advertising space within all media (print, broadcast television, cable, radio, out-of-home and Internet)" (Master Service Agreement, ¶ 6.5).

**B.      The Contracts Between the Parties.**

3.      On March 22, 2000, iXL and AdOutlet entered into a Master Service Agreement ("the Agreement"), pursuant to which iXL agreed to provide AdOutlet with consulting and web design services on an hourly fee and expense basis (S.A.C., ¶ 6). As a substantial part of those services, iXL was to create computer "source code" to assist in the operation of AdOutlet's web site (Pl.'s Mem., Ex. 1 (Smith Aff.), ¶ 4). The AdOutlet web site – located at www.adoutlet.com -- provides, among other things, a means by which media outlets can display and sell advertising time to companies or individuals (*Id.*, ¶ 3).

4.      The Agreement contemplated that the specific tasks that iXL would perform, and the price for those tasks, would be set forth in separate Statements of Work ("S.O.W."), which would

incorporate the terms of the Agreement (Agreement, ¶ 1.1). Set forth below are the terms of the Agreement and the Statements of Work most germane to the present motion.

**1.    The Agreement.**

5.    Under the Agreement, iXL possessed the authority to "determine the method, details, and means of performing the services to be performed hereunder, subject to the standards set forth in the Statement of Work and the approval of Client, which shall not be unreasonably withheld" (Agreement, ¶ 3). iXL warranted that it would perform services for AdOutlet "in material conformity to the specifications set forth in a Statement of Work contemplated hereunder in a professional and workmanlike manner" (*Id.*, ¶ 9.3). At the same time, the Agreement contained a disclaimer by iXL, stating that it did not warrant that its services would be "error free," or that AdOutlet would be able to obtain certain results due to the services provided by iXL, or that iXL was providing any warranty of merchantability, title, or fitness for a particular purpose (*Id.*, ¶ 10).

6.    The Agreement specified that for the services provided under the Agreement, AdOutlet "shall pay to iXL the fees in the amount and manner set forth in the Statement of Work" (Agreement, ¶ 5.1), as well as expenses (*Id.*, ¶ 5.2). The Agreement stated that fees and expenses would be billed monthly (*Id.*, ¶ 5.1), and that amounts billed by iXL "will be due and payable within thirty (30) days after the due date of an invoice therefor from iXL" (*Id.*, ¶ 5.4). The Agreement provided for imposition of late charges of one and one-half percent per month (*Id.*, ¶ 5.4). The Agreement also set forth the remedies that iXL could pursue in the event of nonpayment by AdOutlet. If AdOutlet failed to pay for sixty days after the date of the invoice, the Agreement authorized iXL's "suspension of the performance of the services" (*Id.*, ¶5.4). The Agreement further provided that if iXL pursued legal action to recover on unpaid invoices, AdOutlet would be liable

4

to pay "in addition to any amount past due, plus interest accrued thereon, all reasonable expenses incurred by iXL in enforcing this Agreement, including, but not limited to, all expenses of any legal proceeding related thereto and all reasonable attorneys' fees incurred in connection therewith" (*Id.*, ¶ 5.4).

7.    The Agreement provided for various circumstances under which the Agreement could be terminated.  For example, the Agreement provided that upon a default of payment by AdOutlet, which had not been cured within thirty days, iXL could terminate the Agreement upon written notice (Agreement, ¶ 4.4).  The Agreement further provided for termination upon other material defaults of duties and obligations under the Agreement (other than payment obligations), if there was a failure to substantially cure or commence a cure of the default within thirty days of receiving written notice (*Id.*, ¶ 4.2).  Termination for any of these foregoing reasons required notice, specifying the date of termination.  The Agreement stated that upon termination of the Agreement for any of the specified reasons, AdOutlet "shall be obligated to pay iXL for all services rendered pursuant to any outstanding Statements of Work through the effective date of such termination" (*Id.*, ¶ 4.6).

8.    The Agreement also set forth broad limitations of liability.  Consequential and punitive damages, the recovery of lost profits, and damages for loss of business "arising out of or in any way related to this Agreement, the performance thereof, the use of the products promised or services delivered pursuant to this Agreement, and/or a party's alleged breach of this Agreement" are excluded (Agreement, ¶ 11.1).  Damages "of any kind arising out of or in any way related to this Agreement, the performance thereof, the products or services delivered pursuant to this Agreement, and/or a party's alleged breach of this Agreement" cannot exceed "the amount of the fee paid by Client to iXL" (*Id.*, ¶ 11.2).  Moreover, the Agreement specified that these limitations on liability

apply to "all causes of action" whether based on "federal, state and/or local law and/or ordinance" (*Id.*, ¶ 11.3).

9.     The Agreement contemplated that the parties would exchange confidential information, and thus set forth terms defining what would constitute such information and governing its use. The Agreement provided that "Confidential Information" would include information prepared by a party (whether in oral, written or digital form) relating to, among other things, research, software, developments, processes, and engineering (Agreement, ¶ 6.2), so long as it was not "independently developed by the receiving party without reference to the disclosing party's confidential information" (*Id.*, ¶ 6.3). The Agreement provided that upon termination, Confidential Information is to be returned or destroyed (*Id.*, ¶ 6.1).

10.     The parties agreed that construction of the Agreement would be governed by the law of the state in which iXL's office is located (Agreement, ¶ 15.4) – which is Illinois (*see, e.g., Id.*, ¶ 14). The parties likewise agreed that any suits concerning disputes under this Agreement would be brought in a court located in the state in which iXL's office is located (*Id.*, ¶ 15.4).[2]

11.     The Agreement contained a merger and integration clause, indicating that the Agreement constituted the "complete and exclusive statement of the agreement between them, and supersede[s] all prior contemporaneous proposals, oral or written, and all other communications between them relating to the subject matter hereof" (Agreement, ¶ 15.7).

---

[2]When the payment dispute first arose, iXL brought a collection suit in state court in New York, which is the state in which AdOulet maintains an office to which notices under the Agreement are to be sent (Agreement, ¶ 14). In that suit, iXL asserted contract claims and a common law claim for misappropriation of intellectual property – but did not assert a copyright claim or a prayer for injunctive relief (Def.'s Mem., Ex. 4). According to iXL (Pl.'s Mem. at 7-8 n. 3), iXL dismissed the state court action in light of the venue provision in the Agreement.

12.     The Agreement also makes clear that iXL and AdOutlet did not intend to become "partners, joint venturers, representatives or agents of each other" (Agreement, ¶ 15.10). This particular provision was of obvious significance to the parties: while the Agreement stated that subsequent Statements of Work would control to the extent they might contain provisions different from those set forth in the Agreement, the Agreement specifically provided that this would not be the case with respect to paragraph 15.10. To the contrary, the Agreement provided that if a Statement of Work contained language purporting to make the parties joint venturers or partners, that language would not be effective and paragraph 15.10 of the Agreement would control (Agreement, ¶ 1.2).

**2.     Statements of Work.**

13.     Pursuant to the Agreement, the parties entered into six separate Statements of Work (each of those Statements of Work, along with the exhibits, is attached to the Amended Complaint). The Statements of Work each followed a specific format. A Statement of Work would set forth the scope of a project, a start date, a project timetable, the work to be delivered to AdOutlet, a proposed completion date, and a price. Each Statement of Work then would contain an attachment, setting forth various consulting terms and conditions (Exhibit A to each Statement of Work), and – as necessary – other attachments elaborating on the work to be performed. We focus here on the terms and conditions.

14.     The Statements of Work defined the "Services" that iXL would perform as those set forth in the Statement of Work, and "Works" as "all deliverables developed or prepared by iXL in the performance of Services hereunder" (S.O.W., Ex. A, ¶¶ 1.2, 1.4). The Statements of Work contemplated that in performing Services and Works for AdOutlet, iXL would use certain "Pre-

Existing Works" that already had been developed by iXL (S.O.W., Ex. A, ¶ 1.1); that iXL also would use certain "Client Materials" obtained from AdOutlet, such as information and ideas (*Id.*, ¶ 2.2); and that iXL would create certain new material for AdOutlet. Paragraph 3 of the consulting terms and conditions set forth the ownership rights in these three different categories of materials. Because it is central to the present motion, we set forth below that provision in its entirety:

3. **"Work for Hire"**. Client shall retain all title to Client Materials, including all copies thereof and all rights to patents, copyrights, trademarks, trade secrets and other intellectual property rights inherent in such Client Materials. iXL shall not, by virtue of this Statement or otherwise, acquire any proprietary rights whatsoever in the Client Materials, which shall be the sole and exclusive property of Client. *With the exception of Pre-Existing Works, the Services provided by iXL and the Works shall constitute "work made for hire" for Client, as that phrase is defined in Sections 101 and 201 of the Copyright Act of 1976 (Title 17, United States Code), and Client shall be considered the author and shall be the copyright owner of the Works. If and to the extent that the foregoing provisions do not operate to vest fully and effectively in Client such rights, iXL hereby grants and assigns to Client all rights which may not have so vested, (except for rights in the Pre-Existing Works).* iXL shall execute such documents and do such other acts as may be reasonably necessary to further evidence or effectuate Client's rights in and to the Works. *If any of the Works except the Pre-Existing Works do not qualify for treatment as a "work for hire" or if iXL retains any interest in any components of the Works for any other reason, iXL hereby grants, assigns and transfers to Client ownership of all United States and international copyrights and all other intellectual property rights in the Works, subject to certain rights iXL described herein, and all the rights of use with respect thereof which are intended to be conferred hereunder and under the Statement, free and clear of any and all claims for royalties or other compensation except as stated in this Statement.* iXL grants Client in perpetuity a nonexclusive, non-transferable license throughout the world to the Pre-Existing Works that are incorporated in iXL Works provided to the Client under this Statement for use with such Works.

(S.O.W., Ex. A, ¶ 3) (emphasis added.)[3]

---

[3]The Copyright Act defines "work made for hire" as "(1) a work prepared by an employee within the scope of his or her employment; or (2) a work specially ordered or commissioned for use as a contribution to a collective work, as part of a motion picture or other audio visual work, as a translation, as a supplementary work, as a compilation, as an instructional text, as a test, as answer material for a test, or as an atlas, if the parties expressly agree in a written

15.     The Statements of Work provided that AdOutlet "shall perform the tasks set forth in this Statement, as a condition to iXL's obligations to perform hereunder," and that at iXL's request AdOutlet shall provide client materials "required by iXL to perform the tasks set forth in the Statement" (*Id.*, ¶ 2.2). The Statements of Work further provided that AdOutlet "shall comply in a timely manner, with all reasonable requests of iXL for assistance in enabling iXL to fulfill any of iXL's obligations under this Statement," and that a failure by AdOutlet to meet its deadlines would result in an extension of the time allowed for iXL to perform (S.O.W., Ex. A, ¶ 2.4).

16.     The Statements of Work provided AdOutlet with certain options to pursue if AdOutlet was dissatisfied with iXL's work. In the first instance, AdOutlet was required notify iXL of any material nonconformity within two weeks after delivery of the work. In the event of such notice, iXL had a period of thirty days to correct the nonconformity. If AdOutlet believed that iXL had failed to do so within thirty days, AdOutlet had two choices: (a) it could "reasonably" extend iXL's time to correct the alleged nonconformities, or (b) it could terminate the Agreement (*Id.*, ¶ 2.3). In the event of the termination, AdOutlet was entitled to a refund of the amounts paid to iXL, provided that AdOutlet returned to iXL all of iXL's Confidential Information (*Id.*).

**C.      The Business Transactions Between the Parties**.

17.     Statement of Work No. 1 was signed by the parties by April 27, 2000; Statement of Work No. 2 by May 5, 2000; Statement of Work No. 3 by April 27, 2000; Statement of Work No. 4 by May 5, 2000; Statement of Work No. 5 by May 19, 2000; and Statement of Work No. 6 by

---

instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. The Copyright Act further provides that "[i]n the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

May 19, 2000. While these Statements of Work all were signed in April and May of 2000, some of the work performed by iXL (at least on Statement of Work No. 1) took place earlier.

18.    Set forth below in text is a chart (taken from Ex. 1(O) to AdOutlet's Memorandum), setting forth for each Statement of Work the cost estimate provided, the amount actually billed, the amount paid, and the amount billed but unpaid (these numbers vary slightly from those alleged in the complaint (*see* S.A.C. ¶¶ 12-14), but we use these numbers as they are undisputed in the evidence submitted on the motion):

| S.O.W. | Cost Estimate | Billing | | | Amount Paid | Amount Unpaid |
|---|---|---|---|---|---|---|
| | | Invoice | Date | Amount | | |
| Assessment[4] | $235,000.00 | 63-133044 | 02/29/00 | $236,620.00 | $236,620.00 | 0 |
| 1 | $787,200.00 | 63-133043 | 02/29/00 | 393,988.00 | 393,988.00 | 0 |
| | | 63-200286 | 06/05/00 | 398,971.00 | 398,971.00 | 0 |
| | | 63-202059 | 08/02/00 | 6,119.00 | 0 | 6,119.00 |
| 2 | $30,000.00 | 63-200287 | 06/05/00 | 37,405.00 | 37,405.00 | 0 |
| 3 | $52,000.00 | 63-201677 | 07/17/00 | 36,707.00 | 0 | 36,707.00 |
| 4 | $281,425.00 | 63-200317 | 06/05/00 | 128,521.00 | 128,521.00 | 0 |
| | | 63-202057 | 08/02/00 | 123,045.00 | 0 | 123,045.00 |
| 5 | $650,000.00-850,000.00 | 63-200744 | 06/16/00 | 192,727.00 | 0 | 192,727.00 |
| | | 63-201679 | 07/17/00 | 653,863.00 | 0 | 653,863.00 |
| | | 63-202377 | 08/03/00 | 248,859.00 | 0 | 248,859.00 |
| | | 63-203669 | 07/29/00 | 171,510.00 | 0 | 171,510.00 |

---

[4]In February 2000, prior to the signing of the Agreement, the parties apparently engaged in a project for some assessment to be performed by iXL (*see* AdOutlet's Mem., Ex. 1(O)). We also include that work on the chart, although it does not appear to have been performed pursuant to a Statement of Work.

| S.O.W. | Cost Estimate | Billing | | | Amount Paid | Amount Unpaid |
|---|---|---|---|---|---|---|
| | | Invoice | Date | Amount | | |
| 6 | $289,000.00 | 63-202058 | 08/02/00 | 236,590.00 | 0 | 236,590.00 |
| | | 63-203049 | 08/31/00 | 48,783.00 | 0 | 48,783.00 |
| TOTAL | $2,324,625.00- 2,524,625.00 | | | $2,913,708.00 | $1,195,505.00 | $1,718,203.00 |

19.     AdOutlet does not dispute that iXL actually worked the hours for which it billed AdOutlet (Pl.'s Reply Mem., Ex. A (Shane Dep.) at 81, 82).  As the chart makes clear, and as the parties do not dispute, iXL has billed AdOutlet $2,913,708.00 for hours expended and expenses incurred in performing work pursuant to the Statements of Work and the Agreement; setting aside expenses, the total amount billed for the hourly component ($2,853,767.00) exceeded the cost estimate by $329,142.00.  Most of that excess is attributable to Statement of Work No. 5, which involved the source code for the launch of the web site – the hourly fee for that work exceeded iXL's estimate by some $400,000.00 (iXL brought most of the other tasks in somewhat under the cost estimated).

20.     The chart also reveals another fact that the parties do not dispute:  that is, that AdOutlet has paid far less than the amount billed.  AdOutlet has paid $1,195,505.00, leaving a balance billed but unpaid of $1,718,203.00.  An analysis of the chart further shows that all of the payments made by AdOutlet were on invoices that were submitted on or before June 5, 2000.  AdOutlet made no payments whatsoever on Statements of Works Nos. 3, 5 and 6, and paid only a little more than half of the invoice amount on Statement of Work No. 4.

**D.    Disputes Between the Parties Concerning the Source Code**.

21.    During the summer of 2000, iXL sent portions of the source code to AdOutlet by e-mail.  On or about October 1, 2000, iXL delivered to AdOutlet two compact discs containing the source code iXL created for the web site.[5] As it was delivered to AdOutlet, the source code provided by iXL bore a legend stating that AdOutlet owns the copyright (*Id.*, at ¶ 13 and Ex. J thereto).

22.    The payment disputes between the parties reflect the ongoing disagreements between the parties during iXL's performance of work of AdOutlet.  AdOutlet has submitted documents reflecting AdOutlet's repeated and contemporaneous assertions that the work performed by iXL was inadequate, and resulted in AdOutlet having to shoulder more of the burden and incur more internal staff costs than would have been the case had iXL performed more capably (*see, e.g.*, AdOutlet Mem., Ex. 1 (Shane Aff.) ¶¶ 8-9).  In particular, there were disputes concerning the source code to be used in connection with AdOutlet's web site. AdOutlet claims that despite receiving specific and detailed instructions from iXL (*Id.*, ¶ 6), the source code prepared by iXL was fraught with defects, which over a period of several months iXL had difficulty in correcting and that, as a result, AdOutlet personnel had to fix (*Id.*, ¶¶ 8-9).  AdOutlet claims that the vast majority of the source code used for the AdOutlet web site thus was developed by AdOutlet, and not iXL (*Id.*, ¶ 11).

23.    While iXL does not directly dispute that it encountered some difficulties in supplying code and other information that met AdOutlet's requirements, iXL contends that iXL ultimately provided satisfactory code and other information – which iXL contends AdOutlet is using without paying for it (Pl.'s Reply Mem., Ex. C (Smith Aff.), ¶¶ 5-6).  In particular, and contrary to

---

[5]The parties do not specify the precise date of delivery, but the Court derives the October 1 date from the e-mails submitted by AdOutlet, which show that this was iXL's planned delivery date (*see* Def.'s Mem., Ex. 1 (Shane Aff.), at Ex. K).

AdOutlet's assertion, iXL claims that most of the code it supplied has been only minimally changed by AdOutlet, if at all (*Id.*, ¶¶ 7-15).

24.     Despite its criticisms about the quality of the code iXL supplied, AdOutlet admits that it has not exercised its option under paragraph 2.3 of the terms and conditions to the Statements of Work to reject the source code, to return it to iXL, and to terminate the Agreement. Rather, AdOutlet has installed the source code and continues to use it on its web site. AdOutlet further admits that without the portions of the source code that were supplied by iXL, AdOutlet's web site would have to be shut down, since users would not be able to "officially or efficiently do transactions" (Pl.'s Reply Mem., Ex. A (Shane Rule 30(b)(6) Deposition), at 159).

25.     Despite their disputes, the parties do agree about certain key points concerning the source code. The parties agree that the source code is copyrightable – indeed, they scarcely could maintain otherwise, since each has filed an application for a copyright in the code. On February 2, 2001, iXL filed an application for copyright in the work entitled "Online Media Management System" (S.A.C., Ex. E). In that application, iXL designated itself as the author, and indicated that the contribution was a "work made for hire" (Pl.'s Mem., Ex. C). And, on March 12, 2001, AdOutlet filed its own competing application for copyright.

26.     Moreover, the parties agree that to the extent the source code was developed by iXL (and they agree that at least some of it was), that source code falls within the definition of "works made for hire" within paragraph 3 of the terms and conditions to the Statements of Work. There also is no dispute that the source code developed for AdOutlet's web site is of no use to anyone other than AdOutlet. iXL does not seek the return of the source code. That reflects the practical reality that the source code was developed pursuant to specific specifications set forth by AdOutlet to fit with

13

programs designed specifically for AdOutlet, and thus could not be used by others -- including iXL (AdOutlet Mem., Ex. 1 (Shane Aff.) at ¶ 12).

27.     Finally, while the parties disagree about whether the contract documents vested ownership of the source code in AdOutlet immediately, without regard to payment or other contractual disputes that may arise (which is AdOutlet's position), the parties agree that at the end of this case the most likely result is that AdOutlet will have title to the copyright. If iXL wins the lawsuit, AdOutlet will have to pay some or all of the contract balance (which, even under iXL's theory, would give AdOutlet title to the copyright). If AdOutlet prevails on its defense that it need pay no more, then it will own the copyright (because, even under iXL's theory, AdOutlet has paid all that is required).

## II.

"The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held." *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). Because the purpose of a preliminary injunction is limited, so too is the proof that must be offered to support it. A party thus is not required to prove its case in full at the preliminary injunction hearing. *Id.*

By the same token, it is not the province of the Court to issue preliminary injunctive relief to rectify every situation that a plaintiff may protest as unfair. A preliminary injunction "is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam) (emphasis original), quoting 11 C. WRIGHT, A. MILLER & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2948, at 129-30 (2d ed. 1995). Thus, a plaintiff must clear significant thresholds in

order to obtain preliminary injunctive relief. In the Seventh Circuit, "a party seeking a preliminary injunction must demonstrate: (1) some likelihood of succeeding on the merits, and (2) that it has 'no adequate remedy at law' and will suffer 'irreparable harm' if preliminary relief is denied." *Abbott Labs. v. Meade Johnson Co.*, 971 F.2d 6, 11 (7th Cir. 1992) (citing *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1433 (7th Cir. 1986); *see also Allied Signal, Inc. v. B.F. Goodrich Co.*, 183 F.3d 568, 573 (7th Cir. 1999); *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386-87 (7th Cir. 1984). "If the moving party cannot establish either of these prerequisites, a court's inquiry is over and the injunction must be denied. If, however, the moving party clears both thresholds, the Court must then consider: (3) the irreparable harm the nonmoving party will suffer if preliminary relief is granted, balancing that harm against the irreparable harm to the moving party if relief is denied; and (4) the public interest, meaning the consequences of granting or denying the injunction to non parties." *Abbott Labs.*, 971 F.2d at 11-12. The Court then weighs all four factors, as would a chancellor in equity, seeking to "minimize the costs of being mistaken" *Id.* at 12 (citing *American Hospital Supply Corp. v. Hospital Products, Ltd.*, 780 F.2d 589, 593 (7th Cir. 1986)).

In this case, we believe that the motion for preliminary injunction may be resolved by focusing solely on the threshold elements, as plaintiff at this point has made out at best only a weak case for likelihood of success on the merits of the copyright claim and has failed to establish irreparable harm.

## A. Likelihood of Success in the Merits.

The Copyright Act of 1976 protects original works of authorship fixed in a tangible medium of expression. 17 U.S.C. § 102(a). The protection extends to a broad array of subject matter including pictorial, graphic, sculptural and literary works, 17 U.S.C. § 102(a)(1), which includes

computer programs. *qad, inc. v. ALN Associates, Inc.*, 974 F.2d 834, 835 (7th Cir. 1992). A copyright gives the owner exclusive rights to reproduce the work, to prepare derivative works based on the original, to distribute copies of the work to the public, and to display the work publicly. 17 U.S.C. § 106.

To establish copyright infringement, a plaintiff must demonstrate (1) ownership of a valid copyright, and (2) unauthorized copying of the original constituent elements of the work. *Feist Publications, Inc. v. Rural Tl. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994). In this case, we find the first element dispositive of the question of likelihood of success.

## 1.    Ownership of a Valid Copyright.

iXL has established a reasonable likelihood of establishing that the source code at issue is copyrightable. The source code qualifies as "Works" and "Services" as defined in the Statements of Work (see S.O.W., Ex. A, ¶¶ 1.2, 1.4). Under the Statements of Work, the parties agreed that "Services" performed by iXL and "Works" developed or prepared by iXL and delivered to AdOutlet would constitute "works made for hire" under the Copyright Act (*Id.*, at ¶ 3). While the parties cannot confer by private agreement copyright status on that which is not copyrightable under governing law, *see, e.g., Feist*, 499 U.S. at 346 ('[o]riginality is a constitutional requirement" for copyright protection), in this case it appears that the source code created by iXL falls within the definition of "work made for hire" under 17 U.S.C. § 101. The source code was "specially ordered or commissioned for use," and qualifies as a "contribution to a collective work": the source code written for each section of the AdOutlet web site constitutes a separate, independent work and is a contribution to the collective whole – that is, the web site. And, AdOutlet could scarcely argue that

the source code is not copyrightable, since AdOutlet has filed its own application seeking the copyright on that material.

The difficulty that iXL confronts is in establishing a likelihood of success on the proposition that iXL, rather than AdOutlet, is the owner of a copyright in the source code. On this point, iXL runs headlong into the language of the Agreement that iXL itself drafted.[6] The Statements of Work specifically state that the Works and Services provided by iXL (which include the source code) are works made for hire for AdOutlet, and that AdOutlet "shall be considered the author and shall be the copyright owner of the works." This language plainly constitutes an express agreement that the source code is work made for hire, as required by 17 U.S.C. § 101. Under 17 U.S.C. § 201(b), the "person for whom the work was prepared [here, AdOutlet] is considered the author for purposes of this title, and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright."

iXL contends that taken together, the Agreement and the Statements of Work show that the parties have "expressly agreed otherwise," by making full payment of the invoices a condition precedent to AdOutlet's ownership of the source code. In order for iXL to demonstrate likelihood of succeeding on this point, iXL must show both (1) that it is likely to succeed on its claim that AdOutlet breached the contract by nonpayment, and (2) that such a breach deprives iXL of ownership of the source code.

iXL has shown some likelihood of success on this first point. Under Illinois law (which governs under the choice of law provision in the Agreement), iXL must establish the following

---

[6]During oral argument, iXL's counsel conceded that iXL drafted the agreements – although they were negotiated, the contracts were on forms used by iXL.

elements to prove a breach of contract claim: (1) the existence of a valid and enforceable contract; (2) performance by iXL; (3) breach by AdOutlet; and (4) resulting injury to iXL. *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 611 (Ill. App. Ct. 1st Dist. 1999). There is nothing here to suggest that the Agreement and the Statements of Work, signed by both parties, are not valid and enforceable. Nor is there any dispute that iXL has billed AdOutlet for some $2.9 million of time and expense that iXL actually incurred in providing services to AdOutlet, that AdOutlet has not paid nearly that full amount, and that as a result iXL has suffered injury – iXL admittedly has received some $1.7 million less than it billed AdOutlet. While AdOutlet asserts that iXL failed to perform adequately under the Agreement and that AdOutlet's failure to pay the full amount is thus not a breach, there is evidence that could establish AdOutlet has accepted iXL's work. The evidence shows that AdOutlet has not returned the source code submitted by iXL, and has not exercised the procedure set forth in the contract for termination upon iXL's failure to timely correct non-conforming works: AdOutlet has not returned the source code and sought a refund (S.O.W., Ex. A, ¶ 2.3(ii).[7] To the contrary, the evidence shows that AdOutlet is using the source code developed by iXL on the web site, and that the source code developed by iXL is a critical component to the operation of AdOutlet's web site. At oral argument, counsel for AdOutlet acknowledged that the question of whether there was adequate performance by iXL involves disputed facts that would have to be resolved by the jury at trial. Given these circumstances, the Court finds that iXL has established some likelihood of success on its claim of breach of contract.

---

[7]At oral argument, AdOutlet argued that it has exercised its option under paragraph 2.3(i) – that is, to "reasonably extend iXL's time to correct . . . non-conformities" beyond the 30-day period given for cure. Given that (according to AdOutlet) the non-conformities go back well over six months, and that AdOutlet says it has been forced to correct them, the Court is skeptical that paragraph 2.3(i) applies. AdOutlet's interpretation of paragraph 2.3, carried to its logical end, could allow AdOutlet to unilaterally create a situation in which iXL's product is never accepted but also never rejected.

However, iXL has not established a likelihood of success on the proposition that a breach of contract results in AdOutlet being deprived of ownership of the source code. The Statements of Work provide that the Services provided by iXL are "works made for hire" for AdOutlet (S.O.W., Ex. A, ¶ 3). The Copyright Act provides that the person for whom the work was prepared is considered the author and owns the rights comprised in the copyright "unless the parties have expressly agreed otherwise in a written instrument signed by them." 17 U.S.C. § 201(b). The Agreement and the Statements of Work contain no express agreement that AdOutlet will be considered the author of the source code and the owner of its copyright only after full payment of the invoices. Nor do these agreements state that AdOutlet is barred from using the source code in its web site if AdOutlet has failed to pay the full invoice amount. Indeed, when iXL delivered the CD Roms containing the source code on or about October 1, 2000 – by which time AdOutlet already was nearly $900,000 in arrears in payment for more than 60 days – iXL nonetheless affixed to the code a legend identifying AdOutlet as the holder of the copyright.[8]

In the absence of an express agreement, iXL attempts to cobble together an implied condition that AdOutlet cannot own (or use) the source code until it has made full payment of the invoice price to iXL. iXL points to two provisions in particular, neither of which bears the weight that iXL seeks to place on it.

*First*, iXL points to paragraph 2.2 of the terms and conditions of the Statements of Work, which state that AdOutlet "shall perform the tasks set forth in the Statement as a condition to iXL's obligations to perform hereunder." iXL claims that this language establishes that full payment by

---

[8]This figure of nearly $900,000 is derived from adding together Invoices 63-201677, 63-200744, and 63-201679, all of which were dated on or before July 17, 2000, and thus had been unpaid for more than 60 days by October 1, 2000.

AdOutlet is a condition precedent to AdOutlet being deemed the author and copyright holder of the source code. iXL certainly could have made full payment by AdOutlet a condition precedent. *See, e.g., MXL Industries, Inc. v. Mulder*, 252 Ill. App. 3d, 18, 25 (2d Dist. 1993) ("a condition precedent . . . is to be performed by one party to an existing contract before the other party is obligated to perform"). But it is hard to read paragraph 2.2 as doing so. The word "tasks" is not defined in the Agreement or in the Statements of Work. The Court finds it plausible that paragraph 2.2 is to be read in conjunction with paragraph 2.4, which provides that iXL's obligation to meet contractual deadlines is contingent upon AdOutlet complying "in a timely manner, with all reasonable requests of iXL." But to construe "task" to mean "full payment" by AdOutlet, as iXL argues, would make no sense. Read that way, under paragraph 2.2 iXL would have absolutely no "obligations to perform" until AdOutlet first had paid the full contract price – which is clearly not what the parties intended, as measured both by the wording of the contract[9] and the actual course of performance by the parties.[10]

---

[9]The Statements of Work all provide that "iXL's services *shall* begin" on a specified start date, and "continue until completion . . . or termination" (S.O.W., ¶ 3) (emphasis added), and that iXL shall bill monthly "for the services rendered" (*Id.*, ¶ 2; *see also* Agreement ¶, 5.1). Moreover, the Agreement allows iXL to suspend work if there is a 60-day delinquency in payment (Agreement, ¶ 5.4). These terms clearly contemplate that services would be rendered before payment by AdOutlet.

[10]The evidence shows that iXL in fact routinely rendered services first, and then billed for them later. Indeed, it appears that iXL did not deliver the CD ROMS containing the source code until on or about October 1, 2000 (see Def.'s Mem., Ex. I (Shane Aff.), Ex. K), even though by that time, AdOutlet had failed to pay several invoices for more than sixty days, thereby "justifying iXL's suspension of the performance of the Services" (Agreement, ¶ 5.4). To the extent there could be any ambiguity about the meaning of paragraph 2.2, this course of performance evidence undermines iXL's current interpretation of that paragraph. *See, e.g., Chicago & Northwestern Railway Co. v. Peoria & Pekin Union Railway Co.*, 46 Ill. App. 3d 95, 100-101 (3d Dist. 1977) (in case of ambiguity, court relied on parties' course of performance as evidence of their "settled construction" and relying on Restatement (Second) of Contracts Section 228(4), held that "the parties to an agreement are in the best position to know what they meant, and their action under the contract is often the strongest evidence of their intended meaning"); FARNSWORTH ON CONTRACTS, § 7.13, at 318 n. 30 (quoting an English judge who once said: "show me what the parties did under the contract and I will show you what the contract means").

*Second*, iXL relies on paragraph 3 of the terms and conditions, and in particular, the sixth sentence of that paragraph, which states as follows:

> If any of the Works except the Pre-Existing Works do not qualify for treatment as a "work for hire" or if iXL retains any interest in any components of the works for any other reason, iXL hereby grants, assigns and transfers to Client ownership of all United States and international copyrights and all other intellectual property rights in the Works, subject to certain rights of iXL described herein, and all the rights of use in respect thereof which are intended to be conferred hereunder and under the Statement, free and clear of any and all claims for royalties or other compensation except as stated in this Statement.

iXL correctly notes that the grant of right set forth in this sentence states that it is being made free and clear of any and all claims for royalties or other compensation *except as stated in this Statement*. But the Court does not believe that sentence makes payment a precondition to vesting of authorship and copyright ownership in AdOutlet, whether viewing the sentence in isolation or in the context of the entire paragraph.

Read in isolation, the Court believes that this sentence does not make the vesting of authorship and ownership contingent on payment, but rather, indicates that in transferring those rights, iXL did so free and clear of any claims for royalty or other compensation, but without waiver of iXL's right to payment as set forth in the Statements of Work. Put another way, this sentence does not make payment by AdOutlet a precondition to authorship and ownership rights in a source code vesting in AdOutlet; rather, the sentence makes clear that the vesting of those rights in AdOutlet does not extinguish iXL's right to payment for services.

Moreover, viewed in the context of the entire paragraph, it is hard to see as a practical matter when this sentence would come into operation. The third sentence of paragraph 3 states that as to the materials that shall constitute works made for hire (including the source code), AdOutlet "shall

21

be considered the author and shall be the copyright owner of the works." That sentence has no ambiguity or qualification, and expresses no contingency in the vesting of authorship and ownership. The very next sentence, moreover, provides that "[i]f and to the extent that the foregoing provisions do not operate to vest fully and effectively in [AdOutlet] such rights iXL hereby grants and assigns to [AdOutlet] all rights which may not have so vested [] (except for rights in the Pre-Existing Works)." That sentence appears to account for the possibility that despite the parties' agreement, the Services or Works rendered by iXL might not qualify for copyright protection, in which case that sentence would vest ownership of any non-copyright material in AdOutlet – again, with that grant being unqualified and unconditional. In light of those two broad grants of ownership in AdOutlet, which cover the Works and Services both in the event they are copyrightable and in the event that they are not, it is hard to envision when the sixth sentence in paragraph 3.3 on which iXL relies would ever come into play. To the extent that there is any ambiguity about it, that uncertainty cuts against iXL, which drafted the contracts. *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (applying Illinois law). Thus, we do not believe that paragraph 3.3 contains the kind of express statement required by 17 U.S.C. § 201(b) to limit or qualify AdOutlet's rights of ownership.

iXL also argues that in the absence of a clear contractual provision, the Court should imply payment by AdOutlet as a condition precedent to vesting of authorship and ownership of the source code by AdOutlet. While each side has cited authority to support its respective position that full payment is an implied condition precedent to vesting of authorship and ownership in AdOutlet, *Black v. Pizza Time Theaters, Inc.*, 1983 WL 1140 (N.D. Cal. Aug. 15, 1983), *Hughey v. Paleographics Co.*, 189 U.S.P.Q. 527, 532-33 (D. Colo. 1976), NIMMER ON COPYRIGHT, § 5.03[E]

at 5-55, 56 (1999 ed.), or is not a precondition, *Real Estate Data, Inc. v. Sidwell Co.*, 809 F.2d 366, 371 (7th Cir. 1987), *Glovaroma, Inc. v. MalJack Productions, Inc.*, 71 F. Supp. 2d 846, 851 (N.D. Ill. 1999); *Natkin v. Winfrey*, 111 F. Supp. 2d 1003, 1008 (N.D. Ill. 2000), the Court does not find any of those authorities persuasive here. AdOutlet's authorities do not deal with the situation of a failure to pay by the client, as is alleged to be the case here. And iXL's authorities all deal with the scenario not present here: where the plaintiffs did not seek contract damages, but instead sought recision of the contract and return of the intellectual property. In this case, iXL does not want the copyright material back, because it was created for AdOutlet's particular specifications and thus is useless by iXL (except perhaps for leverage in resolving this payment dispute).[11]

In any event, we agree with the observation the court in *Royal v. Leading Edge Products, Inc.*, 833 F.2d 1, 3 (1st Cir. 1987), that there is "scant reason" to imply any condition concerning ownership of a copyright when an "unambiguous compact occupies the field." In *Royal*, the defendant had entered into a royalty agreement with plaintiff, one of its employees. Plaintiff was thereafter terminated, and defendant ceased paying royalties. In rejecting the plaintiff's assertion that the copyright reverted to him as a result of the alleged failure to pay royalties, the court noted that the royalty agreement explicitly addressed the consequences that would flow from termination of employment, and that "[r]eversion of the copyright is not among those consequences." 833 F.2d at 3. The court reasoned that "[w]here, as here, the contract is clear, courts must be loath to presume

---

[11]While iXL places great weight on *In re Amica, Inc.*, 135 B.R. 534 (BR N.D. Ill. 1992), we find that decision inapposite. The case did not involve work for hire, and the relevant contract provided for reversion of the software to the creator if there was nonpayment – a remedy that the creator there in fact sought, unlike the case here.

added promises out of thin air," and that "[t]he express terms of [plaintiffs] bargain with the company leave no room for unstated conditions to creep into the deal." *Id.* at 3-4.[12]

In this case, iXL drafted the Agreement and the Statements of Work, and negotiated it at arms length with AdOutlet. iXL had every opportunity, and presumably every incentive, to provide in the Agreement and the Statements of Work for adequate safeguards to insure payment – including a provision that conditioned AdOutlet's right of ownership in use of the copyright information upon payment of the full invoice price. Now that the contract has gone sour, iXL asks the Court to step in and provide it with a remedy (and with leverage) that iXL did not bargain for. The Court does not believe that iXL has shown some likelihood of succeeding in that effort.[13]

## B.    Existence of Irreparable Harm and Absence of Adequate Remedy at Law.

"Irreparable injury may normally be presumed from a showing of copyright infringement." *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 620 (7th Cir. 1982). Here, because iXL has not made a sufficient showing of likelihood of success, no presumption applies. Moreover, even if the presumption applied, it would be just that – a presumption. And on

---

[12]*Royal* also points to another potential problem with iXL's copyright claim: it may not "arise[s] under" federal copyright law. In *Royal*, the court affirmed the dismissal of the complaint for lack of subject matter jurisdiction on the reasoning that whatever the outcome of the case, the plaintiff "would have no statutorily based ownership rights." 833 F.2d at 3. That is also the case here. If iXL wins the case, AdOutlet would be required to pay damages – at which time, under iXL's theory, AdOutlet would own the copyright (and there is no argument raised by iXL that AdOutlet is unable to pay). If AdOutlet wins, then AdOutlet was the owner of the copyright all along. As in *Royal*, either way, iXL would not have any copyright ownership interests. *See also Malinowski v. Playboy Enterprises, Inc.*, 706 F. Supp. 611, 615 (N.D. Ill. 1989) ("nonpayment of royalties do not constitute claims arising out of the Copyright Act"). Here, of course, a lack of jurisdiction under the copyright laws would not end the case in this court, as there exists diversity jurisdiction over the state law claims. But this potential jurisdictional problem further adds to the doubt that iXL will succeed on the copyright claim.

[13]In its reply brief, iXL argues that even if it is not likely to succeed on the copyright claim, it is likely to succeed on the claim for misappropriation of intellectual property set forth in Count V (Pl.'s Reply Mem. 9-10). However, paragraph 3.3 of the terms and conditions on its face vests ownership of the source code in AdOutlet, whether it is a matter of copyright law or other intellectual property. Thus, we do not believe that iXL has any better likelihood of success on the misappropriation claim than on the copyright claim. Moreover, iXL ignores that its prayer for injunctive relief is solely with respect to the copyright claim, and not as to the misappropriation claim (S.A.C., at 11).

the facts of this case, we do not believe such a presumption would be sufficient to establish irreparable harm.

iXL concedes, as it must, that it does not compete with AdOutlet; thus, this is not a case where a competitor is taking a plaintiff's intellectual property and using it to the plaintiff's competitive disadvantage. Nor is this a case in which a defendant is depriving plaintiff of the use of property; here, iXL has no desire to get the source code back, and no use to make of it if the source code was returned. And, this is not a situation in which any loss to iXL is not measurable (and remediable) by money; to the contrary, the contract price represents iXL's valuation of the intellectual property.

Rather, iXL's lead argument is that AdOutlet's conduct is causing irreparable harm because AdOutlet (and other unnamed companies like it) are refusing to pay the amounts charged on the invoices by iXL, and that in large part as a result of this conduct, iXL is "currently undergoing financial difficulties" (Pl.'s Mem. Ex. 3 (Michaelson Aff.), at ¶ 5). The case law in this Circuit establishes that in an appropriate case, a damages remedy may be inadequate (and thus lead to irreparable harm) if it "may come too late to save the plaintiff's business." *Roland Mach.*, 749 F.2d at 386; *see also Young v. Ballis*, 762 F. Supp. 823, 827 (S.D. Ind. 1990) (an injunction may issue if it is "necessary to save a plaintiff's business from insolvency"). But for two reasons, this is not such a case.

*First*, although AdOutlet chooses not to answer iXL's assertion of "financial difficulties," that conclusory one sentence assertion is insufficient support for a showing of irreparable harm. iXL offers no backup for that assertion, and does not disclose the extent of its financial difficulties. Certainly, iXL does not assert that bankruptcy is in the offing. To support an injunction, "[t]he

likelihood of injury must be real, not speculative." *Young,* 762 F. Supp. at 827. Here, there is no evidence that iXL cannot hold out until a trial on the merits to recover the damages it seeks.[14]

*Second,* we do not believe that iXL's "financial difficulties" can support a finding of irreparable harm here, because even accepting iXL's assertion at face value, those difficulties are in some measure problems of iXL's own making. In so stating, the Court does not in any way excuse or condone the conduct of a party that ignores its contractual obligations. If that is what happened here, then AdOutlet will pay – not only the contract amount, but interest and iXL's attorneys' fees as well. But iXL must accept that it had some responsibility to negotiate for terms in the agreements that would provide protection acceptable to iXL in the event of a breach. Repeatedly during oral argument, iXL's attorney complained that during the pendency of this dispute, AdOutlet was in the enviable position of both having the source code and holding onto the money, while iXL had neither. But there were plenty of options that iXL could have pursued in negotiating the contract to insure that that would not be the case. For example, iXL could have required that AdOutlet provide a standby letter of credit, so that if there was a failure to pay, iXL could present a demand to AdOutlet's bank and obtain immediate payment without interference by AdOutlet.[15] Or, iXL could

---

[14]To that end, the Court – with the agreement of the parties – has imposed an accelerated discovery schedule, so that all non-expert discovery will be completed by May 22, 2001.

[15]Illinois law defines a letter of credit as "an engagement by a bank or other person made at the request of a customer . . . that the issuer will honor drafts or other demands for payment upon compliance with conditions specified in the credit." 810 ILCS 5/5-103(1)(a). Under a letter of credit arrangement, there are three separate contracts:

> The first is the contract between the beneficiary and the customer. . . which is the contract underlying the letter of credit. The second is between the customer and the bank, when the customer offers collateral in exchange for the bank's issuance of a letter of credit. The third contract is between the bank and the beneficiary, wherein the bank agrees to pay the beneficiary an amount stated when and if the beneficiary complies with the terms cited in the letter of credit.

*Banco del Estado v. Navistar Int'l,* 954 F. Supp. 1275, 1282 (N.D. Ill. 1997), citing *Jupiter Orrington Corp. v. Zweifel,*

have negotiated for a contractual provision that expressly prohibited AdOutlet from using the source code on the web site until AdOutlet had fully paid the invoice price. There may be very good business reasons why iXL did not insist on those provisions, or others like them. But having failed to do so, whether for good reasons or not, iXL cannot transform that business decision into a case of irreparable harm.

Finally, iXL's theory of irreparable harm does not match the preliminary injunction it seeks. iXL says that its harm is the financial difficulty in which iXL finds itself. However, the preliminary injunction that iXL seeks only would bar AdOutlet from using the source code. It would not bring money into iXL's coffers (at least directly). For all of these reasons, the Court finds that iXL has not made a showing of irreparable harm.[16]

## C.    Balance of Hardships/Public Interest.

Because iXL has failed to establish some likelihood of succeeding on the merits of the copyright claim and irreparable harm in the absence of preliminary relief, the balance of hardships

---

469 N.E.2d 590, 592 (Ill. App. Ct. 1st Dist. 1984).

Under this arrangement, "[a]n issuer must honor a draft or demand for payment which complies with the terms of the relevant credit regardless of whether the goods or documents conform to the underlying contract . . . between the customer and beneficiary." 810 ILCS 5/5-114(1); *see also Pioneer Bank v. Seiko Sporting Goods, U.S.A. Co.*, 540 N.E. 2d 808, 811 (Ill. App. Ct. 1st Dist. 1989) (emphasis added) ("when the documents presented [by the beneficiary] comply with conditions specified in the letter of credit, the issuer [the bank] is authorized *and obligated* to pay"). Disputes – and even alleged fraud – in the performance of the underlying contract are insufficient to bar the beneficiary from drawing on the letter of credit. *Jupiter Orrington*, 469 N.E. 2d at 593, 594. The Seventh Circuit thus has aptly described the letter of credit as being "designed to avoid complex disputes about how much the beneficiaries 'really' owe. The promise and premise are 'pay now, argue later.'" *Eakin v. Continental Illinois Nat. Bank & Trust Co.*, 875 F.2d 114, 116 (7th Cir. 1989).

[16]iXL also argues that AdOutlet's use of the source code causes irreparable harm by eroding the value of the intellectual property (Pl.'s Mem. 9), but fails to explain how. This is not a case where wide dissemination of intellectual property causes it to lose uniqueness and value, as might be the case with a distinctive trademark that is diluted by unauthorized and wide spread use. In this case, the whole purpose of the source code was for AdOutlet to use it; iXL does not use it, and does not want to use it. Nor is this a situation where AdOutlet is allegedly eroding iXL's good name and good will in the market by putting out a shoddy product that is improperly associated with the iXL name.

and the public interest elements do not come into play. *Abbott Labs.*, 971 F.2d at 11. However, even were it otherwise, and we considered those factors as part of the mix, the outcome would be the same: iXL would not make out a claim for preliminary injunctive relief.

The purpose of weighing the four factors relevant to a request for injunctive relief is to find a resolution that seeks to "minimize the costs of being mistaken." *Abbott*, 971 F.2d at 11. Hence, the more likely the moving party is to win on the merits, the less heavily the balance of harms need to weigh in favor of that party. *Roland Mach*, 749 F.2d at 387. Here, because any likelihood of success iXL has on the copyright claim is dubious, under any formulation iXL would have to show that the balance of harms weights compellingly in favor of granting a preliminary injunction. But iXL fails to do so. The harm iXL would suffer in the absence of a preliminary injunction is precisely the same harm it still would suffer if a preliminary injunction is granted: iXL must wait until the end of the case to see if AdOutlet will be required to pay more money on the contract. On the other hand, the evidence shows that if a preliminary injunction is granted and AdOutlet is enjoined from using the source code, AdOutlet would not be able to operate the web site, a detriment that makes it difficult for the Court to say that iXL has shown the balance of hardships would tip compellingly in its favor.[17]

As for the public interest inquiry, that seeks to determine whether granting or denying a preliminary injunction "will have consequences beyond the immediate parties." *Roland Mach.*, 749 F.2d at 388. Certainly, the case law makes it plain that the public interest is served by "preserv[ing]"

---

[17]The Court does not believe that this is a case, such as that in *Atari*, in which this possible harm to AdOutlet "merits little equitable consideration." In *Atari*, the court was presented with a case in which the plaintiff had established a likelihood of success on its claim that defendant had engaged in copyright infringement, and was using the infringing product to compete unfairly against the plaintiff. In this case, the parties are not competitors, and all agree that at the end of the case the likely result is that AdOutlet will own any copyright in the source code.

the integrity of the copyright laws which seek to encourage individual effort and creativity by granting valuable enforceable rights." *Atari*, 672 F.2d at 620. But here, iXL's claim of copyright infringement is sufficiently weak that it cannot be said that the purposes of the copyright laws would be vindicated by a preliminary injunction. iXL argues that the public (and iXL) would be served by a preliminary injunction that sends a message that the courts will not countenance to a contract taking the benefits of the contract and refusing to pay for them. Setting aside theories of the virtues of "efficient breach" of contract, *e.g., Patton v. Mid-Continent Systems, Inc.*, 841 F.2d 742, 750 (7th Cir. 1989), which we do not believe this case presents, there is some force to iXL's point. But it is an argument that proves too much, as that same rationale could be urged to argue for preliminary injunctive relief to issue in any breach of contract case. On the other hand, there is the public interest to be served in encouraging business people to carefully consider the bargains that they make, and not to rely on courts to rewrite the agreements to include terms that the parties did not, or could not, obtain through negotiation. Thus, even taking into account the balance of hardships and public interest factors, iXL has failed to demonstrate an entitlement to preliminary injunctive relief.

## CONCLUSION

For the foregoing reasons, the Court respectfully recommends that iXL's motion for preliminary injunction (doc. # 11) be denied. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court

in the report and recommendation. *See Video Views, Inc. v. Studio 21, Ltd.*, 797 F.2d 538, 539 (7th Cir. 1986).

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

Dated:  March 29, 2001